# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

EVERETT A. STILES,

       Plaintiff,

  *vs.*

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

       Defendant.

CAUSE NO.  1:15-cv-1642-DKL-SEB

### ENTRY

Plaintiff Everett A. Stiles applied for disability benefits under the supplemental security income program ("S.S.I.") of the Social Security Act.   The defendant Commissioner of Social Security denied his application and Mr. Stiles filed this suit for judicial review of the Commissioner's decision.   On the parties' consents, the district judge referred this Cause to this magistrate judge to conduct all proceedings and order the entry of final judgment.  *Order of Reference* [doc. 16].  This Entry explains the Court's findings and conclusions on review of the Commissioner's decision.

### Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If

the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations.  Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."   42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process.  42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling.  20 C.F.R. § 404.1525.  If the applicant's

impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions.  At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.  42 U.S.C. § 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work

4

level, then the grids may not be used to determine disability at that level.  Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.  *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. § 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

**Background**

A hearing before an ALJ was held in April 2014, during which Mr. Stiles, a medical expert, a psychological expert, and a vocational expert testified.  (R. 38, 39.)  Mr. Stiles was represented by counsel during the administrative proceedings and the hearing. (Different counsel represents him in this suit.)  The ALJ issued his decision in June 2014.

At step one of the sequential evaluation process, the ALJ found that Mr. Stiles had not engaged in substantial gainful activity since he filed his application on July 18, 2012. At step two, he found that Mr. Stiles has several severe impairments:  (1) degenerative disc disease, (2) osteoarthritis of his right foot, (3) chronic obstructive pulmonary disease ("COPD"), (4) obstructive sleep apnea, (5) depression, (6) anxiety disease, (7) post-traumatic-stress disorder, (8) borderline intellectual disorder, (9) coronary artery disease, and (10) substance and alcohol abuse.  At step three, the ALJ found that Mr. Stiles's impairments, singly or in combination, do not meet or medically equal the severity of any of the conditions in the listing of impairments.

For the purposes of steps four and five, the ALJ determined Mr. Stiles's RFC, the most that he can function with his impairments.  He found that Mr. Stiles has the RFC to perform work at the sedentary level (lift and or carry up to 10 pounds occasionally and frequently,[2] stand and/or walk up to 2 hours and sit up to 6 hours in an 8-hour workday) with the following significant restrictions:  (1) only occasional bilateral fingering; (2) mentally, only simple and repetitive tasks; (3) mentally, only occasional contact with the

---

[2] The Court suspects the ALJ mistakenly described the same weight limit for both functions.

public, co-workers, and supervisors; (4) only work with routine expectations, with little or no change during the week; and (5) "no fast paced and assembly type work." (R. 21.)

At step four, the ALJ found that the defined RFC prevented Mr. Stiles from performing any of his past relevant work. At step five, the ALJ relied on the testimony of the vocational expert to find that, considering Mr. Stiles's RFC, age, education, and transferability of skills, he is able to perform occupations such as surveillance system monitor (500 jobs in Indiana and 19,000 jobs nationally), coupon counter/scanner (1,200 Indiana, 72,000 nation), and general laborer (1,600 Indiana, 48,000 nation). The ALJ found that these numbers are significant in the national economy and, therefore, Mr. Stiles is not disabled.

## Discussion

Mr. Stiles argues two categories of errors by the ALJ in his decision.

**1. Discrepancies and inaccuracies in the vocational expert's testimony.** Mr. Stiles argues that discrepancies between the vocational requirements of the three occupations identified by the vocational expert and the criteria listed in the *Dictionary of Occupational Titles* ("*D.O.T.*"), and inaccuracies in the vocational expert selection of occupations render the ALJ's reliance on the vocational expert's testimony and, thus, his finding of non-disability, unsupported by substantial evidence and the result of legal error. The Commissioner argues that Mr. Stiles forfeited his objections to the vocational expert's testimony by failing to raise them at the hearing.

**Surveillance-system monitor.** Mr. Stiles argues that, while the "surveillance system monitor" occupation identified by the vocational expert satisfies the exertional, SVP,[3] and postural limits of the RFC defined by the ALJ, the *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* (the "*S.C.O.*")[4] provides that the job requires "frequent talking" and a temperament of "dealing with people beyond giving and receiving instructions," both of which contradict Mr. Stiles's RFC restriction to only occasional interaction with the public, co-workers, and supervisors. Mr. Stiles also argues that the occupation of surveillance system monitor, which was last defined in the *D.O.T.* in 1986, is stale. The more up-to-date O*NET[5] divides the *D.O.T.* occupation into the occupations of gaming surveillance officers and protective-service workers. The O*NET classifies both of these occupations with SVPs of 4 to 6 (at the upper end of the semi-skilled and into the skilled work grades), which Mr. Stiles argues are inconsistent with his RFC restriction to simple and repetitive tasks, with routine expectations. Finally, Mr. Stiles contends that, according to the O*NET, the gaming-surveillance-officer occupations require speaking as well as daily telephonic and face-to-face contact with others and most of the the protective-service-workers occupations require constant

---

[3] SVP is the *specific vocational preparation* time rating that the U. S. Department of Labor assigns to each occupation listed in the *D.O.T.* Unskilled work corresponds to an SVP of 1 or 2; semi-skilled work to an SVP of 3 or 4; and skilled work to an SVP of 5 to 9. S.S.R. 00-4p.

[4] The *S.C.O.*, produced by the U. S. Department of Labor, is a companion publication of the *D.O.T.* The Social Security Administration "relies primarily on [both] for information about the requirements of work in the national economy." S.S.R. 00-4p.

[5] The O*NET is the *Occupational Information Network*, also produced by the U. S. Department of Labor. It is intended eventually to replace the *D.O.T.*, the latest edition of which which was published in 1991.

contact with others as well as group work.   Mr. Stiles argues that these vocational characteristics contradict the ALJ's RFC restriction to only occasional contact with the public, co-workers, and supervisors.

**Coupon counter/scanner.**   Mr. Stiles points out that the *D.O.T.* code that the vocational expert gave for the occupation of "coupon counter/scanner" is erroneous; it is actually the code for "parimutuel-ticket checker," which requires *constant* handling, reaching, and fingering, which renders it inconsistent with his RFC restriction to only *occasional* bilateral fingering.   Mr. Stiles goes further and identifies four *D.O.T.* occupations involving coupons that the vocational experts might have intended, namely coupon-manifest clerk, coupon and bond collection clerk, coupon collection clerk, and coupon redemption clerk.   All of them, however, are precluded by their characteristics of frequent reaching, handling, and fingering; SVPs of 4 and 5; and/or  a light, rather than sedentary, exertional level.

**General labor.**   Finally, Mr. Stiles points out that the *D.O.T.* code that the vocational expert gave for "general labor" is actually the code for the occupation of "leaf tier (tobacco)."[6]  He argues that both the *D.O.T.* and the *S.C.O.* describe this occupation

---

[6] A leaf tier "[t]ies tobacco leaves in hands (bundles) to facilitate processing:  Selects loose leaves for hand and arranges leaves with butt ends together.  Winds tie leaf around butts and pulls end of tie leaf into hand."  *Dictionary of Occupational Titles* (4th Ed., Rev. 1991), 529.687-138, available at United States Department of Labor, Office of Administrative Law Judges Law Library, www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT05D.HTM (last visited March 6, 2017).

as requiring *frequent* reaching, handling, and fingering, which, as explained above, he argues is precluded by the ALJ's RFC restriction to only *occasional* bilateral fingering.

The Commissioner argues that, under the holding of *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002), Mr. Stiles's arguments come too late and, therefore, are forfeited.  The claimant's attorney in *Donahue* did not cross-examine or question the vocational expert at the hearing, but raised his argument about the inconsistency of the vocational expert's testimony with the *D.O.T.* only after the hearing had concluded.[7]  The Court of Appeals for the Seventh Circuit held that the claimant forfeited his argument because he did not raise the inconsistency until after the ALJ's hearing.  *Donahue*, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's . . . .").

*Donahue* was decided before Social Security Ruling 00-4p became effective but it declared that the Ruling "is to much the same effect."  *Id.*, at 446.  S.S.R. 00-4p provides that "[t]he adjudicator must explain the resolution of the conflict [between vocational-expert testimony and the *D.O.T.*] irrespective of how the conflict was identified."  The Court noted that "[t]he ruling requires an explanation only if the discrepancy was 'identified' — that is, if the claimant (or the ALJ on his behalf) noticed the conflict and

---

[7] The opinion does not explicitly state when the claimant first raised his argument — after the hearing but before issuance of the ALJ's decision, between issuance of the ALJ's decision and the Appeal's Council's decision on a request for review, in the district court, or in the Court of Appeals.

asked for substantiation," *id.*, at 446-47, and the opinion's next sentences indicate, *albeit* implicitly, the deadline for identifying a discrepancy:

> Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.  An ALJ is not obliged to reopen the record.  On the record as it stands — that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning — the ALJ was entitled to reach the conclusion she did.

*Id*.  A claimant must raise conflicts between a vocational expert's testimony and the *D.O.T.* before the hearing concludes or he forfeits them as grounds for later challenge on judicial review.

During the hearing in this case, Mr. Stiles's attorney asked the vocational expert only two questions:  he asked for the frequency of fine manipulation for the three identified occupations and he asked whether Mr. Stiles could perform those occupations if he were off-task due to pain for more than twenty percent of a work day.  (R. 95-96.) Counsel asked no questions about inconsistencies between the three occupations' vocational characteristics and the criteria of the *D.O.T.*  Likewise, counsel did not ask the vocational expert about any inaccuracies in his *D.O.T.* codes or about any staleness in the *D.O.T.*'s definitions.  Counsel also did not assert to the ALJ during the hearing that any *D.O.T.* discrepancies, inaccuracies, or problems existed.  The Commissioner argues that, therefore, under the controlling precedent of *Donahue*,  Mr. Stiles forfeited his current arguments.

In reply, Mr. Stiles does not mention *Donahue*.  Instead, he argues only that the Commissioner ignores that he did, in fact, brief his inconsistency and inaccuracy issues,

but that the ALJ failed to address them.  The brief that Mr. Stiles means is his *Post-Hearing Memorandum Regarding Vocational Expert Hearing Testimony*, (R. 288).  Although that brief does present Mr. Stiles' currently asserted inconsistencies and inaccuracies in the vocational expert's testimony, it was submitted *after* the hearing, not before or during.[8] It was imperative, therefore, that Mr. Stiles address *Donahue*'s holding and its indication that inconsistencies asserted after the hearing are forfeited.

This is a close and uncomfortable question.  The Court recognizes the obstacles claimants face in fully and meaningfully cross-examining vocational experts at hearings.  ALJs' hypotheticals, including RFC restrictions, are first disclosed at the hearings, as are vocational experts' identifications of workable occupations.   To meaningful cross-examine a vocational expert requires consulting the *D.O.T.*, *S.C.O.*, and other references at the hearings regarding the myriad vocational characteristics that define those occupations.  The task is made more difficult by what the court of appeals has repeatedly recognized as the staleness of the *D.O.T.*, the lack of an authoritative substitute, and the difficulty of locating reliable alternative sources.   *Donahue* even questions how the expertise of vocational experts, who must fill the gaps, reliably can be determined.  While, on the face of it, Mr. Stiles's brief pointing out the technical errors and inconsistencies in the vocational expert's testimony was completed the same day as the hearing, it can

---

[8] Apparently, Mr. Stiles's counsel prepared the brief almost immediately after the hearing in April 2014 because it bears the same date as the hearing.  It is reasonable to presume that it was received by the Social Security Administration long before the ALJ began writing his decision which was issued in June 2014.

appear impractical to expect claimants' representatives to be prepared to cross-examine vocational experts and to present deficiencies in their testimonies to ALJs "on the fly" during the brief periods at the ends of hearings when vocational experts usually testify, or risk forfeiture of such deficiencies.  It also appears to be impractical from the SSA's perspective if hearings must be extended or adjourned and reconvened to afford claimants adequate opportunities to prepare cross-examination in order to avoid forfeiture.

However, while the Court is sympathetic to the practical difficulties placed on claimants by *Donahue*'s rule, and while the Court finds that Mr. Stiles's litany of errors and *D.O.T.* inconsistencies in the vocational expert's testimony have merit and fatally impugn the reliability of that testimony and, consequently, the ALJ's finding of non-disability — it should be noted that the Commissioner did not attempt a defense on the merits against Mr. Stiles's argued errors — the Court is constrained by *Donahue*. *Donahue*'s statements that discrepancy issues are forfeited if raised after the hearing, its supporting rationale that "[a]n ALJ is not obliged to reopen the record," [9] and its interpretation of S.S.R. 00-4p as consistent with its holding, indicate that the forfeiture line is drawn at the conclusion of the hearing, not the issuance of the ALJ's decision.

Mr. Stiles forfeited his objections to the vocational expert's testimony.

---

[9] An ALJ's decision whether to reopen a hearing to receive new and material evidence is discretionary, 20 C.F.R. § 404.944, and is reviewed for abuse of discretion, *McCleskey v. Astrue*, 606 F.3d 351, 355 (7th Cir. 2010).  Mr. Stiles did not challenge the ALJ's failure to reopen the hearing.

**2.  Credibility determination.**  Mr. Stiles argues that several of the ALJ's reasons for finding his statements about the severity and limitations of his impairments to be less than fully credible are not supported by substantial evidence and/or are contrary to law.

**a.  Lack of work at S.G.A. level.**  The ALJ observed that Mr. Stiles's earnings record shows that he has never worked at the substantial-gainful-activity level, even before his alleged onset date, and he found that this "poor work history" "calls into question the claimant's ultimate motivation to work regardless of the extent to which his impairments may restrict his ability to do so."  (R. 28.)  Mr. Stiles argues that this credibility finding is erroneous for two reasons.  First, his official earnings records might not accurate reflect his work history because there is a reference in the record that Mr. Stiles was working "under the table."  Second, even if accurate, his work history during the periods when he does not allege that he was disabled is irrelevant to his ability to work now when the record proves that he suffers from several disabling impairments.

Because an ALJ is entitled to consider a claimant's work history when making a credibility determination, S.S.R. 96-7p, it is a reasonable inference from a claimant's poor work history when not disabled that he has a general, continuing poor motivation to work regardless of the severity of later impairments.  Therefore, the Court rejects Mr. Stiles's second assertion of error.

Mr. Stiles is correct that a report of Mr. Stiles's visit to a mental-health-clinic during an episode of intoxication accompanied by suicidal statements includes a notation that Mr. Stiles reported he had lost his furniture-moving job two days earlier and that, because

14

he was working "under the table," he would not qualify for unemployment.  (R. 330.)
(The Court notes that Mr. Stiles also testified that he had not collected unemployment
benefits since November, 2011.  (R. 46.).)[10]   Mr. Stiles argues that, because of this
"reference in the file" to under-the-table work, "the official work record may not be the
true reflection of his work record," *Memorandum in Support of Complaint* [doc. 19] ("*Brief*"),
at 16.  Therefore, he argues, the ALJ's reliance on the official work record as evidence of
his "motivation to work" was factually erroneous.

The Court does not agree.  Mr. Stiles's official work record entered the
administrative record early and has been available throughout the administrative
process.  The ALJ questioned Mr. Stiles at the hearing about his work history and Mr.
Stiles testified about his furniture-moving work.  Yet neither Mr. Stiles nor his counsel
indicated that Mr. Stiles had worked under the table or that his official work record was
unreliable as a result.  It is true that the ALJ did not mention at the hearing that Mr. Stiles's
work history was "poor" or indicate that he might construe therefrom that he has a poor
work motivation which reflects poorly on his credibility, which did not signal to Mr.
Stiles's counsel that there was a need to address the under-the-table work.  However, the
brief notation in the clinic record that Mr. Stiles reported that he was working under-the-
table when he lost his furniture-moving job two days earlier does not indicate that his
entire work history was under-the-table or that his official work record is otherwise an

---

[10] Mr. Stiles's alleged onset-of-disability date is November 7, 2011.  During the hearing, he denied
working after that date, (R. 46), but his testimony suggests that he worked as a furniture mover after that
date, (R. 50), and he reported to the clinic in May, 2012, that he had lost his furniture-moving job two days
previously, (R. 330).

15

unreliable indicator of his true work history.  In fact, Mr. Stiles's present argument is that the medical notation means that the official work record "*may* not be the true reflection of his work record;" he does not assert, even now, that all of his work or most of his work was under-the-table or that his official record is otherwise an inaccurate description of his work history.   In addition, the brief medical record notation of Mr. Stiles's unexplained, undetailed statement to the clinician — not highlighted by either Mr. Stiles or his counsel — did not create an obligation on the ALJ to obtain clarification or further details before relying on Mr. Stiles's official work record.

Mr. Stiles has not shown that the ALJ erred.

**b. External stressors.**  The ALJ found Mr. Stiles to be less than fully credible regarding the severity of his mental impairments because he believed that external familial, financial, and relationship stressors (he identified specifically only Mr. Stiles's limited economic means and his grief over the deaths of his brother and granddaughter) contributed to, if not caused, his alleged symptoms of mental impairments:

> Although it is quite conceivable that the claimant is experiencing at least some of the symptoms that he has alleged, the evidence shows that these symptoms are likely due in large part to situational factors rather than to an inherent mental illness.  As such, there is insufficient evidence in the record to support a finding that the claimant's condition could not improve dramatically if these factors were to be minimized or even eliminated.

(R. 28.) Mr. Stiles argues that the ALJ erred by substituting his lay opinion for the treating and other expert medical opinions, and that his interpretation is contradicted by the evidence showing extensive medical treatment with psychiatric medication and a

diagnosis of borderline personality disorder.  Further, there are extensive mental-health treatment records both before and after the subject familial deaths, showing consistency of his impairment and its effects.  The Commissioner responds that the ALJ did not substitute his personal viewpoint for the medical evidence and that evidence does not contradict the ALJ's finding because Mr. Stiles's mental-health providers repeatedly identified the stressors noted by the ALJ as factors that "contribut[ed] to his mental health symptoms" and that "exacerbated his mental health impairments."  *Memorandum in Support of the Commissioner's Decision* [doc. 24] ("*Response*"), at 17-18.

The ALJ's findings that external stressors contributed to and exacerbated Mr. Stiles's mental-health impairment and that the severity of his resulting symptoms would diminish if the stressors were eliminated are not, in fact, credibility findings.  There is no finding or assertion by the ALJ that the contribution of external stressors shows that Mr. Stiles is exaggerating, misdescribing, or lying about his symptoms or his mental impairment.  As the Commissioner points out, Mr. Stiles's mental-health records confirm the impact of familial and economic stresses on his mental impairment.

The only significance of the ALJ's discussion on this point are his findings that (1) Mr. Stiles's symptoms are likely due in large part to "situational factors" rather than to an "inherent mental illness" and (2) minimizing or eliminating the external stressors could dramatically improve his "condition."   Neither of these impact Mr. Stiles's credibility regarding the severity or functionally limiting effects of his mental impairments and neither the ALJ nor the Commissioner identify any contradictory

statements by Mr. Stiles.  The ALJ's findings on this matter relate only to the nature of his impairment and resulting symptoms, and the likelihood of improvement if external stressor were minimized.  As such, the ALJ's reliance on these findings to impugn Mr. Stiles's credibility was erroneous.  Because it is not apparent in what manner or to what degree the ALJ discredited Mr. Styles's credibility as a result, this case must be remanded to the Commissioner for reconsideration.

**c. Better functioning when sober.**  The ALJ found that, although Mr. Stiles has a history of substance abuse, the abuse is episodic and he is able to function "quite well" when he abstains from alcohol and other substances, takes his medication, and otherwise complies with prescribed medical treatments.  (R. 29.)  The ALJ wrote that he considered Mr. Stiles's substance abuse in his decision and found it to be a nonmaterial factor in the determination of his RFC.  *Id*.  Mr. Stiles argues that the ALJ's findings are erroneous because the record shows the following:  **(1)** his mental impairments are severely limiting even when sober; **(2)** he has had difficulty affording his medication since he has been sober; **(3)** his psychiatrist noted that he was "tense, irritable, and had a depressed mood and narrow affect during periods of sobriety," *Brief*, at 17-18; and **(4)** his psychiatrist increased his dose of mood stabilizer when he was sober in order to decrease intrusive, obsessive thinking.  Mr. Stiles argues that all four points show that he is not functioning "quite well" when his is sober.

Mr. Stiles provides record citations for only points (2) and (3) (the same citation for both) and (4).  As only a conclusory statement, without developed legal or factual

support, his first point is moot.  In support of points (2) and (3), Mr. Stiles cites one page of the report of a follow-up visit in February 2014 to a family health services clinic for mental-health treatment.  Regarding his inability to afford his medications, the cited page of the report includes a note that "[h]e implies that that he has had periods of time where he has lapses in his medication because he can't afford the 3$ [*sic*] copay." (R. 933.)  Mr. Stiles's implication to a clinician that there have been unspecified numbers of times over unspecified dates during which he could not afford three-dollar co-pays is much too thin a hook on which to hang his current argument that "[t]he record indicates that since Mr. Stiles has been sober he has had difficulty affording his medication." *Brief*, at 17.

Regarding Mr. Stiles's assertion that the psychiatrist noted that he was "tense, irritable, and had a depressed mood and narrow affect during periods of sobriety," *id.*, at 17-18, the citation does not support that description.  The page cited includes brief notes by the psychiatrist of Mr. Stiles's observed condition during the February 2014 visit:  Mr. Stiles "[a]ppears tense;" he was "[s]lightly irritable but not angry or demanding;" his mood was moderately depressed and he had a narrow range of affect," (R. 933).  There is no suggestion in the psychiatrist's notes connecting these observed features to "periods of sobriety."  He did not note that Mr. Stiles was "irritable," but *slightly* irritable.  He did not note that Mr. Stiles had a "depressed mood," but that he was moderately depressed. The psychiatrist did note that Mr. Stiles had a narrow range of affect and appeared tense, but that was Mr. Stiles's state on the date of that one visit and, again, the page cited

contains no opinion that these symptoms existed regularly whenever Mr. Stiles was abstaining from substances.

To support his point that the psychiatrist increased his dosage of "mood stabilizer medication" while he was sober, Mr. Stiles cites a page from the same report of his February 2014 follow-up visit. That report records the psychiatrist's plan to increase Mr. Stiles's Seroquel dosage "to decrease intrusive obsessive thinking." (R. 934.) The follow-up report shows that Mr. Stiles reported that he had been off of Seroquel and Celexa "for the past few weeks" and that, "since being off medications," he experienced symptoms including feelings of worthlessness, difficulty concentrating, memory problems, restlessness, thoughts of "not wanting to be here," paranoid thoughts and well as auditory and visual hallucinations, (R. 934), all of which well could be described as intrusive obsessive thinking. Mr. Stiles argues that his points, including this one, "is all evidence that Mr. Stiles is not functioning 'quite well' when he is sober." *Brief*, at 18. But this one episode of "intrusive obsessive thinking" that caused the psychiatrist to increase the dosage of one of Mr. Stiles's psychiatric medications is not opposed to the ALJ's finding of well functioning during sobriety because the record reveals that this period of increased psychiatric symptomology was the result of going off medications, not an indication of Mr. Stiles's general status during period of sobriety. In addition, the ALJ did not find that Mr. Stiles did not have a mental impairment when he was sober or that he had no symptoms during periods of sobriety; rather, he found only that Mr. Stiles

functioned quite well when he was sober, *despite* his mental impairment and the presence of symptoms.

Mr. Stiles has not shown that the ALJ erred by citing Mr. Stiles's improved functioning when sober to discredit his statements.

### d. Daily activities.  The ALJ wrote:

> [T]he claimant is able to perform a considerable number of activities of daily living, including maintaining his personal hygiene, cooking, cleaning, and performing yard work, mowing the lawn, shopping, taking walks, doing laundry and maintaining his personal finances.  Although no conclusive proof that he is able to sustain full-time work, his ability to perform these activities on a regular basis must be considered, and it weighs against the credibility of his allegations.

(R. 29.)  Plaintiff first argued that this finding is erroneous because circuit precedent holds that "it is harmful error to equate the ability to perform activities of daily living with the ability to sustain competitive work because the ability to engage in limited daily activities does not contradict allegations of disabling pain; there is inherently more flexibility in scheduling activities of daily living; and there is no minimum standard of preference." *Brief*, at 18.  The Commissioner correctly responded that the ALJ did not equate Mr. Stiles's ability to perform certain daily activities to the ability to perform full-time in a workplace setting; the ALJ only used the inconsistency between Mr. Stiles's asserted limitations and his ability to perform the identified activities as a reason to find him less than fully credible.  In his reply, Mr. Stiles argues, for the first time, that the ALJ also erred by failing to ask Mr. Stiles about, and to address in his decision, how he performed the cited activities, their frequency, and any difficulties that he encountered when he

performed them — in short, by failing to elicit and evaluate evidence of the quality and frequency of Mr. Stiles's activities.

The Court agrees with the Commissioner that the ALJ did not cite Mr. Stiles's activities as evidence of his ability to sustain full-time employment.  However, the Court agrees with Mr. Stiles that, citing his activities as an indication of his lack of full credibility, the ALJ failed to articulate a comparison of Mr. Stiles's activities as performed with his discredited statements about his functional limitations.  All the ALJ articulated was his conclusion and that is insufficient.

Because it is not apparent how much weight the ALJ assigned to this finding, the Court cannot find that the ALJ's error was harmless and the case must be remanded for reconsideration and rearticulation.

**e. Routine and conservative treatment — physical impairments.**  Another reason why the ALJ found Mr. Stiles to be not fully credible is that, except for foot surgery, he received only conservative, routine treatment.  Generally, the ALJ wrote that Mr. Stiles is "mainly" on oral medications to control his symptoms and he has not required aggressive care for his COPD, heart condition, or degenerative disc disease.  He cited the follow specific evidence:  **(1)** Mr. Stiles is on oxygen at night for COPD which appears to have stabilized the condition; **(2)** he does not require oxygen during the day; **(3)** his physical examinations are inconsistent when he doesn't know that he is being watched, which is evidence that he is exacerbating his symptoms either in order obtain drugs or pecuniary

gain (disability benefits); **(4)** there is no evidence that he now requires a cane to ambulate; and **(5)** post-operative examinations show that his foot surgery was a success.

Mr. Stiles argues that the ALJ erred regarding his COPD because **(1)** his need for oxygen at night is an indication that his COPD is severe; **(2)** the ALJ does not mention what aggressive treatment would have confirmed his COPD's disabling severity; **(3)** his doctor has labeled his COPD as "very advanced;" **(4)** the consulting examining doctor commented that his most limiting issues were his shortness of breath and dyspnea on exertion; **(5)** the statement that his COPD has stabilized with nighttime oxygen is not supported by the record; **(6)** there is evidence of permanent changes in his lungs; and **(7)** there is substantial evidence that his COPD is severe. Mr. Stiles argues that the ALJ erred with respect to his degenerative disc disease because **(1)** he started physical therapy shortly before the hearing, and **(2)** MRI and CT scans in the record show significant degenerative disc disease in his cervical spine.

The ALJ already found that Mr. Stiles's COPD is severe at step two of the sequential evaluation process. The significant question is how functionally limiting it is and part of answering that question is determining how credible Mr. Stiles is when he describes his disabling-level symptoms and limitations. Mr. Stiles contends that his need for oxygen at night indicates that his COPD is severe but that inference does not address the condition's functional limitations and he provides no record citation to expert medical evidence stating that his need for oxygen at night confirms that the condition is at a disabling level of limitation. His doctors' descriptions that his COPD is "very advanced"

and is one of his two most limiting issues, and that there is evidence of permanent changes in his lungs, again, does not address the resulting degree of functional limitation that Mr. Stiles has.  Similarly, Mr. Stiles' arguments that he started physical therapy for his degenerative disc disease shortly before the hearing and that scans show significant disease in his cervical spine do not show that the ALJ erred in finding Mr. Stiles not fully credible regarding the degree of functional limitation caused by that condition.

Mr. Stiles is correct that the ALJ's statement that he is not fully credible in part because he "he has not required any aggressive care for his COPD," (R. 29), is erroneous. The ALJ failed to cite any expert medical evidence in the record describing the aggressive treatment that would be expected if Mr. Stiles's COPD were as functionally limiting as he alleged.  The ALJ is not qualified to make such determinations on his own.

The Court notes that Mr. Stiles did not challenge the ALJ's observations that he is exaggerating his symptoms during certain examinations, that there is no evidence that he requires a cane, that post-operative examinations show that his foot surgery was successful, and that he admitted to walking to the store.

This case will be remanded for reconsideration of the ALJ's finding that Mr. Stiles is not entirely credible regarding the degree of functional limitation he has as a result of his COPD because he has not required any aggressive care for that condition.

**f. Conservative treatment — mental impairment.**  The ALJ found that Mr. Stiles has received only conservative treatment for his mental impairments except for when he

is abusing alcohol.  It is when he is abusing alcohol that he cuts himself and requires emergency-room care and/or hospitalizations.  Under this head, the ALJ also found that **(1)** Mr. Stiles's reports that he stopped drinking a year before the hearing are inconsistent with the record evidence that he received emergency-room care for alcohol abuse four months earlier; **(2)**  when Mr. Stiles is not drinking, he does not have suicidal thoughts and has GAF scores in the moderate range; **(3)** Mr. Stiles is not compliant with and abuses his medications, despite admitting that medications help his symptoms; and **(4)** based on Mr. Stiles's moderate GAF scores and his high degree of functioning around his home, findings of moderate limitations in the areas of social functioning and concentration, persistence, or pace, and the moderate mental limitations in the RFC are warranted.  (R. 29.)

Mr. Stiles's only argument is with the ALJ's citation of his "high degree of functioning around his home" for which he refers to his earlier argument that the ALJ's reliance on his activities of daily living is erroneous.  For the reasons expressed above, the Court finds that Mr. Stiles has shown that the ALJ erred in relying on his activities of daily living without articulating an explanatory comparison of the activities with his statements.  However, considering the several other unchallenged reasons articulated by the ALJ to find Mr. Stiles's statements to be less than fully credible regarding the limitations caused by his mental impairment, the Court finds that the ALJ's error was harmless.

**g. Medical opinion.**  The ALJ cited the lack of any treating or examining medical opinion that Mr. Stiles is disabled or limited to a greater extent than in his defined RFC. Mr. Stiles argues that this is erroneous because disability is an issue reserved to the Commissioner and an ALJ is not required to accept such a medical opinion.  "It is harmful error to conclude that the lack of such statement means that he is not disabled when the presence of such a statement would not warrant the finding of disability."  *Brief*, at 20.

Mr. Stiles again confuses the ALJ's credibility rationale for his ultimate disability determination rationale.  An ALJ is required to consider all medical evidence in the record and, while he may not assign controlling weight or "special significance" to  medical opinions on issues reserved to the Commissioner, 20 C.F.R. § 416.927(d), he "must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner," S.S.R. 96-5p.  In light of the many examinations and treatments that Mr. Stiles has received, the lack of any finding or opinion by any of his treating or examining physicians that he is disabled or as functionally limited as he alleges is a circumstance on which the ALJ legitimately may have relied, among the myriad other circumstances reflected in the record, as an element supporting his finding that Mr. Stiles's statements regarding his functional limitations are not entirely credible.

Mr. Stiles has not shown error.

**h. Smoking.**  The ALJ found that, if his impairments were as severe and debilitating as he alleged, "he would have done everything possible to stop smoking."

(R. 30.)  However, despite what the ALJ found to be the well-documented negative effects of smoking on all body systems, recommendations by several physicians to stop, and his severe impairment of COPD, he continues to smoke up to three packs of cigarettes each day.  *Id.*  He found that "these factors do not support his allegations that his impairments are so severe as to cause him to be unable to perform any work-related activities."  *Id.*  Mr. Stiles argues that the ALJ's finding contravenes the teaching of *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000):  "[I]t is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testified that the condition is serious or painful.  Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health."  He also points out that he has made efforts to quit smoking and succeeded as far as reducing his use from three packs to three-quarter packs each day.

The Commissioner responds that the ALJ is on "more solid ground" than the ALJ was in *Shramek*, but she does not explain why.  She also points to evidence that Mr. Stiles declined offers of help to quit smoking.  Finally, she argues that any error was harmless in light of the numerous other reasons itemized by the ALJ to find Mr. Stiles not fully credible.

Mr. Stiles has shown error.  The Commissioner has not shown that *Shramek* does not control the issue here.  The evidence records that Mr. Stiles did attempt to quit smoking, with limited success.  The fact that he also declined offers of help is consistent with *Shramek*'s recognition of the power of addiction, often unresisted even in the face of

27

severe, debilitating COPD and other conditions.  Finally, the Court is not convinced that this error was harmless, particularly considering the other credibility findings that are reversed above.

Mr. Stiles has shown that the ALJ's reliance, in part, on his continued smoking as evidence that he is not entirely credible regarding the severity and resulting functional limitation of his COPD is erroneous.  This finding is based on the ALJ's failure to address the impact of the addictive nature of smoking and Mr. Stiles's attempts to quit.  This case will be remanded for reconsideration and/or re-articulation of this finding.

## Conclusion

The errors found above render the ALJ's decision to deny Mr. Stile's claim for benefits not supported by substantial evidence and the result of legal error.  Plaintiff's claim for S.S.I. benefits will be reversed and remanded to the Commissioner for re-evaluation and re-articulation based on the errors explained above:

1.  The Commissioner shall reconsider the credibility of Mr. Stiles's statements about the severity and limitations of the symptoms of his mental impairments without considering the contribution of financial and grief stressors to his mental impairments and the likelihood that he would experience improvement in symptoms and/or limitations if those stressors were eliminated.  The Court does not rule that those findings were erroneous for all purposes; they were erroneous only for the purpose of evaluating the credibility of Mr. Stiles's statements regarding the severity and limitations of his mental impairments.

**2.**  The Commissioner shall reconsider the effect of Mr. Stiles's activities of daily living on the credibility of his statements about the severity and limitations of the symptoms of his impairments.  Before finding that the level of his activities is inconsistent with his statements, a comparison must be articulated of specific activities with specific statements and an explanation must be articulated of any inconsistencies found.

**3.**  The Commissioner shall re-evaluate the credibility of Mr. Stiles's statements about the severity and functional limitations of his COPD impairment in relation to the nature of his treatment.  Before finding that his statements are not fully credible because his treatment has been routine or conservative, or because there has been a lack of aggressive care, expert medical opinion declaring the specific non-routine, non-conservative, or more aggressive treatments that medically would be expected must be identified.

**4.**  The Commissioner shall re-evaluate the credibility of Mr. Stiles's statements about the severity and functional limitations of his impairments in relation to his continued smoking.  If the Commissioner adheres to her finding that Mr. Stiles's failure to quit smoking tends to discredit his statements, she must articulate a consideration of the addictive nature of smoking and Mr. Stiles's attempts to quit smoking.

**Finally**, because Mr. Stiles's claim is being remanded because of the above errors, the Court encourages the Commissioner on remand also to consider whether to reconsider the occupations that the vocational expert identified that Mr. Stiles can perform.  This is only a suggestion, in light of the forfeited, but apparent, errors in the

vocational expert's testimony described above.  It is not a basis for the Court's reversal and remand or part of its instructions on remand.  The rule of forfeiture properly has been applied here, but, perhaps, the Commissioner might exercise her discretion in light of the practicalities of the situation.

**DONE this date:**  3/17/2017

_Denise K. LaRue_
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.